BARNETTE, Judge.
Louisiana Southern Railway Company brought expropriation proceedings against William P. Weber and Mrs. Jean Kay Weber, his wife, for a railroad right-of-way across property owned by them. A companion suit was filed at the same time to expropriate a right-of-way across the adjoining property owned by Edward Joseph Gore and his wife, Connie Lucille Cowart Gore. The cases were consolidated for trial below and on appeal in this court. The proposed 100-foot right-of-way contains 1.-005 acres of the Weber property and 1.169 acres of the Gore property.
The judgments below granted the right of expropriation and fixed the compensation for the land taken at $600 per acre. This amounted to $603 for the Weber property and $702 for the Gore property. In addition to the compensation, severance damage was allowed on the basis of $300 per acre for 5.48 acres of Weber property, amounting to $1,644, and for 7.5 acres of Gore property, amounting to $2,250. From these judgments plaintiff has appealed.
There is no appeal from the judgments with respect to the awards of $603 and $702 respectively as compensation for the land taken. The issues presented on this appeal are: (1) the amount of severance damages awarded defendants, and (2) the assessment of costs against plaintiff.
The two tracts are located in St. Bernard Parish between Toca Village and Yscloskey on the south side of State Highway 46 which runs along Bayou Terre-aux Boeuf. The Weber property has a frontage of 484 feet and the Gore property a frontage of 500 feet on Highway 46. The depth of each tract is approximately 2,400 feet. (There is a slight variance in depth from east to west boundaries.) There are no improvements on either tract which have any bearing on these proceedings.
Both tracts are low-lying land sloping from an elevation of 5 to 7 feet above mean sea level at the front to approximately 1 foot at the rear property line. Marsh land lies to the rear of both properties, beyond which is Lake Lery. It is difficult to pinpoint with absolute accuracy the exact line between marsh land and solid terrain. Those portions of the tracts lying beyond the right-of-way, especially the last 200 feet, are described as “moist land,” “swampy,” “wet tree land,” and “marsh land.” All of these descriptions would appear to be relatively correct depending on the exact point to which the description applies. We think this is borne out by the aerial photograph and the United States Department of Interior geological survey maps filed in evidence. Defendants do not seriously challenge these descriptions, except to assert that all except the last 200 feet is “suitable for use in the same way as the front section of the property.” It is conceded that this part of the land is subject to tidal overflow. It stands to reason that as land slopes from an elevation of 5 or 7 feet to 1 foot, beyond which, within a relatively short distance, marsh land and sea level is reached, the land depreciates in value until it becomes worthless for use in residential subdivision development.
The Gore property is cleared about half way back, and the Weber property about one-quarter. Both tracts were described as being covered with small trees, brush and palmetto on their uncleared parts. The properties are fenced and are used by Mr. Gore for grazing cattle.
Five real estate appraisers qualified as experts — three for plaintiff and two for defendants. They are in agreement that the highest acreage value is on that portion nearest the front, decreasing as the rear line is approached. The railroad right-of-way crosses on a line approximately separating the front three-quarters and the rear one-quarter of each tract. Plaintiff’s appraisers concluded that the highest and best use of the property was for cattle grazing. Defendants’ appraisers found it to be for residential subdivision development,
*731 Based on comparable sales of nearby similar property, plaintiff’s witnesses arrived at an average overall value of $400 per acre. Defendants’ appraisers placed an overall value of $1,000 per acre, based on certain sales which they classed as comparable. Herein lies the most serious issue in the case.
Ed C. Carrere cited four comparables which we think are pertinent in relation to similarity of property, time of sale, and location. They were from February, 1959 to March, 1960. (In this connection it should be mentioned that this case was tried below in August, 1964.) He fixed an overall value of $400 per acre. Carrere used what a witness for defendants referred to as the “depth table theory” as a formula, by fictitiously dividing each rectangular tract into equal quarters. For the front quarter he placed a 40 percent value of the whole; for the second, 30 percent; for the third, 20 percent; and for the fourth, 10 percent.
Max J. Derbes, Sr., also found $400 per acre overall value based on four compar-ables used by Ed C. Carrere and two additional ones for $400 and $450 per acre respectively.
John Carrere, using the same compar-ables used by Derbes and Ed C. Carrere, arrived at the same value, $400 per acre overall.
Opposed to these appraisals are those of Marx Jeffer and James M. Maloney. Both Jeffer and Maloney used as their principal comparable a purported sale of a 17.37 acre tract, very near the property in question, and quite similar in character, dated July 4, 1963, for $15,000.
We must reject this sale as comparable for the reason that on March 17, 1964, one of the two purported vendors brought suit against the three purported purchasers for nullity of the alleged sale on the ground of fraud. She alleged that the “mark” affixed to the purported deed was not placed there by her or with her knowledge and that it was the result of “misrepresentation and fraud of one or more of the defendants.” Personal service was obtained on each defendant. None of them answered nor otherwise appeared to deny or make claim for reimbursement of the alleged purchase price purportedly paid. On July 9, 1964, a default judgment was confirmed declaring the purported sale null and void, and ordering it cancelled and erased from the conveyance records. We must agree with plaintiff’s argument here that that purported sale was purely fictitious and that the recited consideration was never paid, nor intended to be paid.
Notwithstanding these facts, defendants’ appraisers, particularly Mr. Jeffer, placed much reliance on this purported sale, which he repeatedly referred to in his testimony. He identified the property as the “Mundy” property. His second and only other purported comparable related to five lots in Eastwood Manor Subdivision. One of these sold for $2,200, and the other four each sold for $800. From these he arrived at a valuation of $1,200 per acre for the front half of the subject property and $600 for the back half. He fixed the severance damage at one-half, or $300 per acre, for that portion of the two tracts beyond the right-of-way. We must reject, as did the trial judge, the use of sales of lots in an improved subdivision as true comparables. Mr. Jeffer’s appraisal therefore has no probative value.
James M. Maloney testified that the first comparable taken into consideration was the above-mentioned sale of the so-called “Mun-dy” property, which purportedly was for $864 per acre. This we must reject for the reason stated above. His second comparable was a sale on June 16, 1964, of 25 acres, three and a half miles from the tracts, for $65,000 to the School Board. His third comparable was a sale on May 28, 1963, of a long, narrow strip fronting 204 feet on the highway and running back to the “40 arpent line” containing 36.72 acres at $1,361 per acre. This is referred to as the St. Ber *732 nard Heights sale, an improved subdivision with FHA loan commitments. He referred to sales of lots in Kenilworth Plantation and Eastwood Manor Subdivisions at $812 and $2,200 per lot. He explained he did not use these as comparables, but merely to show what lots could sell for in the area. From these sales he reasoned that the highest and best use of the property would be for residential subdivision development and placed a valuation thereon of $1,000 per acre.
This witness used the “depth table theory” as a formula and made a fictitious division of each tract into two equal parts. He placed a 70 percent value of the whole on the front half and 30 percent on the back half. His application of this formula reached the same percentage valuation as that reached by Ed C. Carrere, except that Carrere broke it down into quarters. Ma-loney fixed severance damage to the Weber property at $1,637 and $2,277 to the Gore property, being 50 percent of the acreage value ($600) of the severed portions.
The comparables used by defendants’ witnesses are not true comparables as we have pointed out, and we must conclude that the appraisals made by plaintiff’s witnesses are on a much more valid basis and must be accepted.
We are not impressed with the defendants’ expressed intention of converting the subject property into residential subdivisions. The facts do not justify Mr. Jeffer’s optimism about the exploding economy of the area and its rapid expansion in residential development. Assuming that there will be an economic boom in the community, there are thousands of acres nearer the developing communities more suitable, from a standpoint of location and elevation, for residential development. There is no proof of demand for residential expansion at this time. From Poydras Junction to the tracts there are at least six subdivisions containing all together less than two dozen homes. Furthermore, defendants have no plans for subdivision development at any time in the foreseeable future.
The development of the subject property for sale of residential lots is at most only a hope of its owners. It is too remote and speculative to serve as a basis for the assumption that its highest and best use is for that purpose. Plaquemines Parish School Board v. Miller, 222 La. 584, 63 So.2d 6 (1953); State Through Dep’t of Highways v. Fontane, 185 So.2d 573 (La. App. 1st Cir. 1966); Central Louisiana Elec. Co. v. Dunbar, 183 So.2d 111 (La.App. 1st Cir. 1965); Central Louisiana Elec. Co. v. Harang, 131 So.2d 398 (La.App. 1st Cir. 1961); Central Louisiana Elec. Co. v. Burns, 131 So.2d 390 (La.App. 1st Cir. 1961).
Notwithstanding the recommendation of its own experts of a $400-per-acre value, which we think the evidence sustains, the plaintiff offered to pay $600 per acre for the right-of-way. This is explained as being for the purpose of uniformity. Some of its right-of-way was obtained for less, but following a judicial decision involving other property, the $600 per acre became the prevailing price paid for other segments of the right-of-way. For the purpose of calculating the compensation to be paid for the land taken and the severance damage, we will proceed from this figure of $600 per acre overall value of the two tracts in question.
Plaintiff’s witnesses insist that this figure, $200 per acre in excess of the land value, is ample to compensate also for any severance damage which may be caused.
The railroad right-of-way will traverse the properties at a slight angle at a point approximately 1,600 feet from the front property line at the nearest point. This will leave the Weber and Gore property between the railroad and the rear property line in an irregular quadrangular shape. The railroad will completely sever from the Weber property a 5.48 acre tract entirely within the back one-quarter. From *733 the Gore property 7.5 acres will be severed and this is almost exactly the back one-quarter of the property. It cannot be disputed that some severance damage will result. Defendants’ witnesses testified this damage would be 50 percent the value of the portions severed. The trial court accepted this figure. It should be pointed out, however, that this percentage of damage is based upon the highest and best use of the property being for residential subdivision development. We have not accepted this basis. It is our opinion that the evidence clearly supports the conclusion that the highest and best use is for cattle grazing. We therefore reject the 50 percent damage formula.
As pointed out above, the properties are under fence. The plaintiff railroad has committed itself unequivocally to build cattle guards at the points where the right-of-way cuts through the fence. It has also obligated itself to provide a suitable grade crossing on the properties. The severance damage will therefore be substantially reduced in our opinion. Except for some inconvenience of ingress and egress, the use of the property for cattle grazing will not be affected substantially.
We think a computation of severance damage on the basis of one-third the value of the severed tracts will do substantial justice on the evidence in the record before us. Plaintiff’s witnesses do not deny that there is some severance damage, however slight it may be. As pointed out above, they contend that the $200 per acre offered above the actual value of $400 is adequate to cover this damage. This would mean one-third of the price offered may be considered, though not specified as such, for severance damage.
We have already observed that one of plaintiff’s experts and one for the defendants used the same formula and arrived at the same percentage in determining the proportionate acre value of the property in each of the four quarters from front to back. Using their formula, the value of the acreage embraced in the fourth quarter of each tract is 10 percent of the overall acreage value. We have accepted $600 per acre as the overall value. Figured on the scale of one acre to each quarter, the total is.$2,400, of which 10 percent, or $240, represents the value per acre of that lying in the fourth quarter. On this basis we compute the severance damage at $80 per acre, being one-third of the value. For 5.48 acres of the Weber property we will allow $438.-40, and for 7.5 acres of the Gore property we will allow $600.
Having reached the conclusion that defendants are entitled to a total amount in excess of that offered by plaintiff, the issue relative to assessment of costs is resolved and requires no further discussion.
The judgment appealed from in Louisiana Southern Railway Company v. William P. Weber and Mrs. Jean Kay, wife of William P. Weber, No. 2498 on the docket of this court, is amended by reducing the award for severance damages from $1,644 to $438.40, and as thus amended, the same is affirmed at plaintiff-appellant’s cost.
The judgment appealed from in Louisiana Southern Railway Company v. Edward Joseph Gore and Connie Lucille Cowart, wife of Edward Joseph Gore, No. 2497 on the docket of this court, is amended by reducing the award for severance damages from $2,-250 to $600, and as thus amended, the same is affirmed at plaintiff-appellant’s cost.
Amended and affirmed.